## STEVENS vs. JANES.

*Eleventh Judicial District Court, April,* 1857.

### EJECTMENT—PRIOR POSSESSION.

Where possession of government lands in good faith is shown, the law presumes it to be by consent of the government and will protect this possessor against those who cannot show title derived from the government contradistinguished from presumption of title growing out of possession.

Where the title in A is merely such a possession, by virtue of the license of the government, A can abandon his title for a consideration verbally and without a deed to B, and B thereby becomes the first possessor under the same license of government and subrogated to all the rights of A as if he had continued possessor without abandoning.

Where plaintiff relies upon possession alone as a title, the defendant may show that the plaintiff has abandoned it.

This case was tried by the court without the intervention of a jury, and the court, substantially finds the following facts:

In June, 1852, Jane Shurr was in possession of a town lot in the city of Placerville, and at that time conveyed the same by quit-claim deed to plaintiff.

Plaintiff recorded his deed and went into possession of the lot. He remained in possession until the fall of 1852, when he sold to Alex. Hunter by verbal contract only and placed him in possession. Hunter placed improvements on the lot worth some $6,000, which were partially destroyed by fire in 1856. He afterwards conveyed to defendant, Janes, in trust for Wells, Fargo & Co., who repaired the buildings and went into possession.

Plaintiff had notice that Hunter was putting the improvements on the lot, and from the time of his verbal sale to Hunter until Hunter sold to Janes, he never made any demand of the possession or claimed to be the owner, and that during that period Hunter was in possession claiming it as his own, and regularly had it assessed in his name and paid the taxes thereon. Whether plaintiff knew of the repairs made by Wells, Fargo & Co. does not appear. Hunter, by the terms of the verbal sale, was to pay $600 for said lot, and interest understood

to be two or three per cent. per month—only $300 was paid by Hunter, and that was in July, 1853.

*Robinson, Beatty, Botts and Sackett,* for Plaintiff.

*Sanderson & Hewes,* for defendant.

HOWELL, J.—The first question that I propose examining in this case is, whether the plaintiff has shown that he ever had any higher or better title than that which is presumed from the possession of public lands, or, to state the question differently, am I to treat the lot in controversy as public land in the possession of a private individual by the permission of the government?

The lot is located in the city of Placerville, in El Dorado county. In Conger et al *vs.* Weaver et al, October term, 1856, it is said that, " every judge is bound to know the history of the country where he presides. This we have held before, and it is also an admitted doctrine of the common law. We must, therefore, know that this State has a large territory ; that upon its acquisition by the United States, from the sparseness of its population, but a small comparative proportion of its land had been granted to private individuals ; that the great bulk of it was land belonging to the government, and that but little as yet has been acquired by individuals by purchase ; that our citizens have gone upon the public lands continuously from a period anterior to the organization of the State government to the present time."

It is made the duty of courts to go to this extent in their judicial knowledge of the countries in which they preside ; then it is a matter of open public notoriety, and a universally admitted fact that the district of country embracing the lot in controversy is public domain, and that the only title of those who have made settlements in this portion of the State, is that which grows out of the occupation of public lands, with the consent or approbation of the government.

Admitting, however, that this is a greater stretch of judicial information than sound reason and the rules of law will permit, the first section of the act for the "protection of settlers," &c., statutes of '55, p. 54, declares that, " *All* lands in this *State* shall be deemed and regarded as *public* lands until the legal title is shown to have passed from the government to private parties." I am aware that

certain provisions of this act have recently received a judicial construction at the hands of the Supreme Court, (Billings vs. Hall, Jan. T., 1857,) and been pronounced unconstitutional; but this is not one of them, nor do I suppose it to be liable to such an objection. It merely raises a presumption against a party which he is at liberty to overcome by proof. If he prove that he or his grantors were the first possessors in good faith, it is sufficient to maintain ejectment against a mere intruder, or one who cannot show a better right. Where possession of this character is shown, the law presumes the possessor to be in by consent of the government and will protect him against all others who cannot show *title* derived from the government, as contradistinguished from *presumption* of title growing out of possession.

He is regarded as having a license from the government to occupy its lands, and good faith and sound policy require that he should be protected.

Now, if I am to take judicial notice that this lot at the time of its settlement was a part of the public domain, or if under the above statute I am so to treat it, as no title has been derived from the government, and no grant exhibited, the plaintiff has shown such title only as is presumed from the occupation of public lands. He proved that Jane A. Shurr was in possession in 1852, and that on the 17th of that month she quit-claimed to him and surrendered her possession. He has shown in her a bare possession unaccompanied by claim or color of title, and that she transmitted to him only such title as she possessed. These facts, according to Conger et al *vs.* Weaver et al, are sufficient to show a license from the government to occupy her lands, and that the occupant will not be treated as a trespasser, and for the reasons so well stated in that case, that, " the government has not only looked on quiescently while the appropriations were being made, but has studiously *encouraged* them in some instances and recognized them in all." The right or license is not acquired by any deed or license technically speaking, but merely by entry upon unappropriated public domain, and using or applying it to the private purposes of the occupant. The possession of the party takes the place of his title deeds and is the evidence of his ownership or license.

Now, as these rights are acquired by appropriation and occupation merely, it follows conclusively that they may be lost or surrendered

by ceasing to appropriate and occupy. No one will controvert the proposition that if A, to-day, enters upon a piece of unappropriated public land, and improves it to any extent, he may next year, or at any time he chooses, surrender it back to the government by ceasing to occupy it, with the intention of discontinuing his appropriation or ownership, or, in short, by abandoning it. It then becomes public property again with all the improvements that have been put there, and under this general license from the government any one may again appropriate it with the improvements in the same manner. If these things can be done, and that they can I think no one will doubt, what is to prevent A or any subsequent occupant of the premises from surrendering to B, for a consideration, and that too verbally and without a deed? Why may he not say to B, I will abandon my possession and right of possession if you will pay me for so doing, under such circumstances as to allow you to become the first occupant after I leave? It is true, under such an arrangement, B's title might not date further back than A's surrender to him. The distinction between such a transaction and a technical conveyance, such as is embraced and referred to by our statute of frauds, is this : that in a deed of bargain and sale the deed itself operates as a transfer of the title and of the possession. The grantor in the deed does not *abandon* his title or possession, but continues to assert title up to the moment of the complete execution and delivery of the deed, at which time it passes to the grantee, thereby connecting a new party with it, who traces it back through his deeds to the fountain head. But where there is a mere surrender or abandonment of possession (which is the occupant's deed, or rather substitute for a deed) there is no title transmitted or passed, but one *lost* merely by act of the occupant, and an *original one* gained by the party to whom he surrendered.

Now let us see whether this case comes under the rule I have laid down.

Plaintiff was in possession and made a verbal sale to Hunter for $600, and delivered him the possession. Hunter afterwards paid $300 of the purchase money, and then deeded to the defendant Janes as trustee for Wells, Fargo & Co. There was a dispute as to whether the $300 was paid, and I think it is immaterial so far as this case is concerned whether it was or not. There were no conditions in the

sale,—nothing from which it could be inferred that Stevens was to retain the title until the money was paid. Had the agreement been reduced to writing in the form of a deed, it would have operated as an unconditional conveyance for $600, to be paid thereafter by Hunter. The title would have passed whether Hunter had ever paid the money or not, and the most the plaintiff could have done would have been to assert a vendor's lien for the purchase money. I refer to these things not for the purpose of making them the predicate of an argument in support of a parol agreement for the *sale* of lands, for I am well aware that the Supreme Court has held in Abell vs. Calderwood, that such an agreement is void under our statute of frauds ; but for the purpose simply of arriving at the intention of the parties, and showing that it was plaintiff's object to surrender his possession to Hunter in consideration of the promise of the latter to pay him $600. This view of the case is further strengthened by the fact, that from the time he sold to Hunter until the latter sold to Wells, Fargo & Co., he stood by and allowed Hunter to assert his title to the lot—pay taxes on it, have it assessed in his own name, and place improvements on it to the value of $600 or $700, without ever claiming it as his own, or pretending to question the validity of the transfer.

Under these circumstances, the plaintiff should be deemed to have surrendered or abandoned his interest in the lot, which was one of possession alone, for the consideration agreed to be paid, and that Hunter became the first possessor thereafter. Under this view of the transaction, it is not obnoxious to the statute of frauds, and does not trench upon the decision of the Supreme Court in Abell vs. Calderwood.

But it is said that inasmuch as the deed from Jane A. Shurr to the plaintiff was on record, at the time of defendants' purchase from Hunter, they took with notice of plaintiff's title, and will not be protected. If I am correct in the principles I have enunciated, the error of the argument is in supposing that Hunter was a purchaser in the technical sense of the term, or that plaintiff had any title to be protected at the time of defendant's purchase.

In the Western and Middle States, where the doctrine that prior possession is sufficient to maintain ejectment has pretty generally prevailed, and where the condition of land titles in the early settlement of those States was very similar to what it is here, it has frequently

been held that if the plaintiff relies upon possession alone, the defendant may show that it has been abandoned. And the same doctrine has been substantially held by the Supreme Court of this State, in Bequette vs. Caulfield, 4 Cal. R., 278. In this case it appears that Caulfield was in possession of a lot in Sacramento City ; Pearis commenced an action for forcible entry and detainer against him before a Justice of the Peace. Caulfield told him that he wanted to have nothing to do with the lot, and that Pearis might take possession. The latter did so, and then sold to Beirne, and he gave plaintiff a bond for a deed, and put him in possession. Caulfield afterwards got possession, and the plaintiff brought ejectment, and the Court, after stating that prior possession will maintain ejectment, say : " Where a party can show nothing but a prior possession, that reliance may fail if it can be shown that he voluntarily abandoned it, without the purpose of returning."

These views render it unnecessary for me to notice the other questions in the case that have been argued at such great length in the briefs of the attorneys.

For the foregoing reasons my conclusions of law are that plaintiff should take nothing by his suit, and that defendants should have judgment for their costs, and the Clerk will enter judgment accordingly.